UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

> USDC-SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC#:
> DATE FILED: 09/20/2022

---

STEADFAST INSURANCE COMPANY,

      Plaintiff/Counterclaim Defendant,

        v.

PORTSMOUTH JV,

      Defendant/Counterclaimant.

---

No. 20-CV-8615 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff/Counterclaim Defendant Steadfast Insurance Company ("Steadfast") filed this action seeking declaratory relief that it is entitled to reimbursement of $5 million it paid to its insured, Defendant/Counterclaimant Portsmouth JV ("PJV"), for costs resulting from damage to a highway construction project in Ohio caused by a third-party. PJV counterclaimed, asserting that it is entitled to the $5 million and that Steadfast is liable for breaching their contract in bad faith. Before the Court are the parties' cross-motions for summary judgment. PJV moves for summary judgment on Steadfast's claim for declaratory judgment, and Steadfast cross moves in its favor on its claim for declaratory judgment and against PJV on its counterclaim for bad faith breach of contract.

For the reasons set forth below, PJV's motion is denied and Steadfast's motion is granted.

## BACKGROUND[1]

PJV is a design-build contractor that, in December of 2014, was awarded a $429.7 million contract to design and build a four-lane, sixteen-mile highway in a rural area of Ohio (the

---

[1] The Court draws the following facts from the parties' 56.1 Statements of Fact ("56.1") and supporting documents.

"Project").  In order to construct the highway, twenty-four new bridges had to be designed and constructed and "approximately 20 million cubic yards of earth had to be excavated or built up for slopes in and around the highway to be designed and constructed."  PJV 56.1 ¶¶ 54–55.  These slopes had to be "designed at a certain level of steepness to control or eliminate the movement of soil and rocks immediately adjacent to the lanes of highway and bridges"—in other words, to prevent landslides that could destabilize the roadway or cause bridge collapses.  *Id.* ¶ 56.  In order to ensure that these slopes were properly designed, the Project required geotechnical expertise.  *Id.* ¶ 60.  To aid in designing the Project, PJV contracted with a lead designer called ms Consultants, Inc. ("MSC" or "Lead Designer") that had the necessary geotechnical expertise.  *Id.* ¶ 2.

## I.    The Policy

To protect against the risk of design errors occurring on the Project, PJV purchased an insurance policy (the "Policy") from Steadfast.  *Id.* ¶ 1; Agati Decl. Ex. 1.  The Policy contains three coverage parts: Part A Coverage, Part B Coverage, and Rectification Indemnity Coverage.

As is relevant here, the Rectification Indemnity Coverage, which is included in the Policy as "Endorsement 11," requires Steadfast "to indemnify [PJV] for [PJV's] 'Costs and Expenses' incurred in rectifying a 'Design Defect' in any part of the construction works or engineering works for any project upon which [PJV] is responsible for both design and construction . . . and for which a third party could otherwise make a 'Claim' against [PJV]."  Agati Decl. Ex. 1 at 32.

A "Design Defect" is defined as "an error, omission or negligent act in the preparation of engineering or architectural designs, plans, drawings, specifications, calculations, surveys and studies."  *Id.* at 33.  The Policy further defines "Costs and Expenses" as "those sums expected to be incurred by [PJV] which are reasonably related to the efforts needed to remedy a 'Design Defect' covered by this endorsement, less any overhead, profit and mark-up of [PJV]."  *Id.*

2

Endorsement 11 further provides as follows:

> If we make any payment under this Rectification Indemnity Coverage, we shall be subrogated to all your rights against any person or organization, including the right to participate with the "Insured" in the exercise of all the "Insured's" rights of recovery. In the event an "Insured" either concurrently or subsequently files a "Protective Indemnity Claim" under this policy or a subsequent renewal for the same "Design Defect" for which the insured is undertaking or has previously undertaken rectification efforts, then any proceeds the "Insured" may receive from the "Design Professional's Insurance" shall be used to reimburse us for any payments under the Rectification Indemnity Coverage afforded under this coverage part. If the proceeds received from the "Design Professional's Insurance" are less than the amount paid by us under this Rectification Indemnity Coverage, then difference between the amount paid by us under this Rectification Indemnity Coverage and the proceeds received from the "Design Professional's Insurance" shall erode the limits of liability available under the Contractor's Protective Liability Coverage Part.

*Id.* at 32.

Under the Rectification Indemnity Coverage part, Steadfast agreed to pay a total amount of up to $5 million in coverage, but only after PJV first paid a $500,000 retention. PJV 56.1 ¶¶ 42, 45.

In addition to the Rectification Indemnity Coverage, the Policy separately contains provisions concerning Steadfast's subrogation rights. Specifically, Condition N of the Policy, "Subrogation and Transfer of Rights of Recovery," is amended by Endorsement 12, entitled "Amendment To Waiver of Subrogation Clients and Others Where Required By Contract." Endorsement 12 reads as follows:

> **N.    SUBROGATION AND TRANSFER OF RIGHTS OF RECOVERY**
>
> If we make any payment under this policy, we shall be subrogated to all your rights against any person or organization, including the right to participate with the "Insured" in the exercise of all the "Insured's" rights of recovery. You shall execute and deliver instruments and papers to us and do whatever else is necessary to secure such rights. With respect to a "Protective Indemnity Claim," this includes a written transfer to us of any assignment(s) of rights obtained under Section **V. CLAIM PROVISIONS, B. PROTECTIVE INDEMNITY CLAIM PROVISIONS**, paragraph 1.B. if the "Insured" has elected not to pursue same in furtherance of its

"Protective Indemnity Claim."  An "Insured" shall do nothing to prejudice such rights as described in this paragraph.

We shall not exercise any such rights against any persons, firms, or corporations included in the definition of an "Insured" or against any entity other than a "Design Professional" if, prior to a "Claim," a waiver of subrogation was so required and accepted under a specific contractual undertaking by you.

Any recovery obtained through subrogation, after expenses incurred in such subrogation are deducted by the party bearing the expense, reimbursement will be made in the following order:

1.  First, to any interest who has paid any amount in excess of the Limit of Liability provided under this policy;

2.  next, to us; and

3.  then to any interest as are entitled to claim the remainder, if any.

All other terms and conditions remain unchanged.

Agati Decl. Ex. 1 at 35.

## II.    PJV's Rectification Indemnity Coverage Claim

Between April 2016 and September 2017, a series of slope failures occurred at different locations along the roadway of the Project, and PJV identified an issue regarding the stability of soil at one the bridges.  PJV 56.1 ¶¶ 61–65.  These slope failures resulted in extensive damage to the Project's roadways and bridges.  "As more and more slope failures and geotechnical issues occurred at various locations, PJV believed the cause of the slope failures and related issues was an error in design," and that its Lead Designer, MSC, was at fault.  *Id.* ¶¶ 66–67.  As a result, PJV needed to undertake remediation efforts to fix these slope failures.  In October 2017, PJV submitted a written notice to Steadfast requesting Rectification Indemnity Coverage.  Fontirroig Decl. ¶ 27.

On March 16, 2018, Steadfast emailed an "insurance coverage advisory letter" to PJV that was dated March 15, 2018 (the "March 2018 Coverage Advisory Letter").  Agati Decl. Ex. 9.  This

4

letter stated, in part:

> Based on the information provided and gathered during the investigation thus far,
> as well as the relevant policy language, Steadfast is reserving all of its rights under
> the law and under the [Policy] under Coverage Part A, Coverage Part B and the
> Rectification Indemnity Coverage.  Please be advised that the continued handling
> and investigation of this matter is being undertaken under a full reservation of rights
> under the above coverage parts.

*Id.* at 4.

In addition to reserving its rights under the Rectification Indemnity Coverage part, the letter

also states, in relevant part:

> In the event Steadfast makes any payment under the policy, please refer to Steadfast's
> subrogation rights as modified by Endorsement 12.  We reserve our rights under the above
> provision and request that your [*sic*] take steps to preserve Steadfast's potential subrogation
> rights.

*Id.* at 10.

PJV began fixing the design errors, and in a June 15, 2018 email to Steadfast, advised that

it had already exceeded the $5 million Rectification Coverage limit.  Agati Decl. Ex. 13.  This

email also contained thousands of pages of documents, including invoices and supporting

materials.  PJV 56.1 ¶¶ 124–27.  In September of 2018, PJV completed the repairs.  Fontirroig

Decl. ¶ 22.  The total cost to repair the design errors that PJV incurred was $19,410,657.60.  *Id.* ¶

23.

On October 12, 2018, the Steadfast Claim Handler emailed their broker intermediary,

advising that it still needed further information from PJV in order to make a determination on

PJV's rectification claim.  PJV 56.1 ¶¶ 135–39.  The broker responded to this email on October

24, 2018, writing: "I am hoping that you can help me understand exactly what additional

information and/or documentation that you require which hasn't already been provided.  To be

frank, I'm having trouble discerning what information would be necessary, particularly in light of

[PJV's] previous responses, all of which appear to be fully responsive to each respective ask."

Agati Decl. Ex. 16.

> The broker again emailed Steadfast on November 12, 2018, stating:
>
> I just don't understand what additional information you would need to make an assessment on the Rectification claim? I know you are waiting on the BoR [Builder's Risk Insurance Policy] payment verification but we all know that Leg 3 will only pay for the first loss. Here the overall losses associated with the clear Designers error far exceed the combination of any BoR payment and the Rectification sub-limit. Assuming you receive verification of the BoR payment— the Rectification amount should be paid. At minimum at time of the mediation [with the Lead Designer] or before.
>
> If additional info is needed counsel and/or Brian [of the brokerage firm] can assist. But honestly enough is enough. There is no question this was a blown design. Exactly the basis for Rectification.

Agati Decl. Ex. 17.

Several days before receiving that email, the Steadfast Claim Handler requested that a Steadfast "Risk Engineer" conduct a "second review of the information provided." PJV 56.1 ¶ 148. While the Claim Handler testified that he could not recall whether he received any results from this second review, Steadfast's claim file notes contained an entry stating that the "Insured's cost to repair/remediate the slope failure well exceed $5.5 M, the $5M policy limit plus the $500K SIR [self-insured retention]. We have received verification previously of the costs to remediate from Risk Engineering who reviewed the insured's cost data." *Id.* ¶ 151.

On December 6, 2018, PJV completed the Project. Fontirroig Decl. ¶ 24. Four days later, Steadfast sent an email to PJV, stating that:

> At this time, we do not believe that PJV has met the threshold burden under the Rectification Indemnity Coverage of proving that its error, omission or negligence in preparation of engineering or architectural designs caused the slope failures at the Project, resulting in liability to a third party that could make a claim against PJV.

6

> It is our understanding the only errors, omissions or negligence regarding the slope failures relates to MS Consultants and S&ME's work at the Project. . . . Given the allegations that the loss at issue is the result of MS Consultants' error and omissions, this matter is likely to be resolved, from Steadfast's perspective, under Coverage Part B.

Agati Decl. Ex. 18 at 5.

### III.    Settlement Agreement & Rectification Claim Release

In February 2019, Steadfast and PJV began negotiations that led to a July 2019 Settlement Agreement and Rectification Claim Release (the "Settlement Agreement").  Agati Decl. Ex. 19. Under this agreement, Steadfast paid PJV $5 million in Rectification Indemnity Coverage. Additionally, the Settlement Agreement contained the following release:

> In consideration of the Rectification Indemnity Coverage Settlement Payment, PJV, on behalf of itself and its past, present and future predecessors, successors, assigns, parents, principals, stockholders, members, partners, affiliates, divisions, subsidiaries, officers, directors, agents, attorneys, adjuster, partners, representatives, servants, and employees, does hereby release and forever discharge Steadfast . . . from and against any and all actions, causes of action, claims and indemnity demands for Rectification Indemnity Coverage under the Policy, payments due and owing to PJV by Steadfast arising from or relating to the $5,000,000 coverage limits under Rectification Indemnity Coverage and any and all actions, causes of action, claims, reimbursements, obligations, costs, expenses, bad faith claims, claims for consequential damages, claims for extra contractual damages, claims for violation of deceptive business acts, claims for unfair settlement practices, debts, judgments, liabilities, damages, and demands, whether known or unknown, solely arising from or relating to the Rectification Claim or Rectification Indemnity Coverage under the Policy.

*Id.* ¶ 3.

### IV.    Arbitration and Steadfast's Request for Reimbursement

Meanwhile, while the parties were communicating and negotiating over coverage under the Policy, PJV commenced an arbitration proceeding against its Lead Designer, MSC, in September 2018.  While the arbitration against MSC was still proceeding, on October 2, 2019, Steadfast sent PJV an email with two letters.  The first was the March 2018 Coverage Advisory

Letter, described above.  The second was a letter that stated, in part:  "To the extent PJV attempts to pursue a Coverage Part B claim under the Steadfast policy for any 'Losses' or 'Damages' arising out of the Project after settling with MS consultants . . . without identifying and ascertaining the full insurance coverage available to those entities, Steadfast reserves the right to disclaim any obligation to indemnify PJV for such 'Losses' or 'Damages.'"  PJV 56.1 ¶ 191.

The arbitration proceeded, and was eventually completed on February 17, 2020.  The arbitration panel ultimately awarded PJV a total sum of $7,501,878.  *Id.*  ¶ 231.  Four days after the conclusion of arbitration, but before the panel issued its decision, Steadfast wrote a letter to the Lead Designer, copying PJV (the "February 21, 2020 Letter").  Agati Decl. Ex. 23.  The letter first advises MSC that Steadfast paid PJV $5 million with regard to PJV's claim under the Rectification Indemnity Coverage Endorsement (Endorsement 11) in accordance with the Settlement Agreement.  The letter continues:

> [A]s indicated by the terms of the [Settlement] Agreement, nothing in that Agreement modified or impaired Steadfast's contractual subrogation right to be subrogated to PJV's rights against any person or organizing, including ms consultants.

The Endorsement provides that:

> > In the event an "Insured" either concurrently or subsequently files a "Protective Indemnity Claim" under this policy or a subsequent renewal for the same "Design Defect" for which the insured is undertaking or has previously undertaken rectification efforts, then any proceeds the "Insured" may receive from the "Design Professional's Insurance" shall be used to reimburse us for any payments under the Rectification Indemnity Coverage afforded under this coverage part.  If the proceeds received from the "Design Professional's Insurance" are less than the amount paid by us under this Rectification Indemnity Coverage, then difference between the amount paid by us under this Rectification Indemnity Coverage and the proceeds received from the "Design Professional's Insurance" shall erode the limits of liability available under the Contractor's Protective Liability Coverage Part.

8

> Moreover, the Agreement specifically refers to that subrogation right as follows:
>
> > Nothing contained in this Agreement shall modify or impair Steadfast's contractual subrogation right to be subrogated to PJV's rights against any person or organization as set forth in Section I.A. of the Policy's Rectification Indemnity Coverage part.
>
> In short, Portsmouth JV filed a Protective Indemnity Claim as defined by the Policy against ms consultants in the Arbitration for the same design defects (slope failures on the Project) that were the subject of the Rectification Claim.  As such, pursuant to the terms of the Endorsement, in the event of an Award in Portsmouth JV's favor in the Arbitration, Steadfast is entitled to the proceeds received from ms consultants' insurance to the extent of its $5,000,000 payment to Portsmouth JV in connection with the Rectification Claim.  Accordingly, in the event of such an Award in Portsmouth JV's favor, on behalf of Steadfast, I must insist that any such payments be made by ms consultants' insurer directly to Steadfast.  Failure to do so will prejudice Steadfast's subrogation rights and expose ms consultants to a direct action by Steadfast.

*Id.*

PJV objected to Steadfast's request that any proceeds up to $5 million from the arbitration should go to Steadfast.  Following the arbitration, the parties agreed to place the $5 million at dispute into an escrow account pending resolution of their dispute.  Smith Decl. Ex. E.

Steadfast filed this action on October 15, 2020 seeking a judgment declaring that it was entitled to reimbursement of the $5 million that was placed in escrow.  PJV counterclaimed, asserting that it—rather than Steadfast—is entitled to the $5 million and that Steadfast committed breach of contract and engaged in bad faith.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).[2]

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  To survive summary judgment, the moving party has the initial burden of demonstrating that no genuine issue of material fact exists.  *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  If it satisfies this burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Id*.

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).  "If there are cross motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgement as a matter of law."  *Admiral Indem. Co. v. Travelers Cas. & Sur. Co. of Am.*, 881 F. Supp. 2d 570, 574 (S.D.N.Y. 2012) (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

## DISCUSSION

### I.     Declaratory Judgment

For the reasons that follow, Steadfast is entitled to reimbursement of the $5 million paid by Steadfast to PJV under the Rectification Indemnity Coverage part of the Policy.

#### A.     Endorsement 11, not Endorsement 12, Governs.

Under New York law, "the interpretation of an insurance policy is a question of law appropriately decided on a motion for summary judgment if the policy is unambiguous." *Admiral Indem.*, 881 F. Supp. 2d at 574–75.  In determining a dispute over insurance coverage, the Court looks to the language of the policy.  *Id.*; *see also Raymond Corp. v. Nat'l Union Fire Ins. Co.*, 833 N.E.2d 232, 234 (N.Y. 2005).  The Court construes the policy "in a way that affords a fair meaning

to all of the language employed by the parties in the contract and leaves no provision without force and effect." *Admiral Indem.*, 881 F. Supp. 2d at 574–75. "If the plain language of the policy is determinative, [the Court] cannot rewrite the agreement by disregarding that language." *Id.* Unambiguous provisions should be given their "plain and ordinary meaning." *White v. Cont'l Cas. Co.*, 848 N.Y.S.2d 603, 605 (N.Y. 2007).

PJV argues that the distribution process set forth in Endorsement 12 should apply where PJV sued a third-party to recover for both itself and Steadfast—in other words, that the distribution process in Endorsement 12 applies regardless of who brings a subrogation action. In support of its argument, PJV argues that when Endorsement 12 is properly interpreted, it applies the distribution process whether PJV or Steadfast prosecuted the arbitration against the Lead Designer. Endorsement 12 states: "If we make any payment, we shall be subrogated to all your rights against any person or organization, including the right to participate with the 'Insured' in the exercise of all the 'Insured's' rights of recovery." Agati Decl. Ex. 1 at 35. PJV argues that inclusion of the word "participate" causes this provision to apply much more broadly than only to Steadfast bringing an action for subrogation. PJV further argues that the distribution process itself further confirms that Endorsement 12 applies if PJV is the party bringing an action that also protects Steadfast's subrogation rights, because the distribution only starts "after expenses incurred in such subrogation are deducted by the party bearing the expense." *Id.* Thus, PJV says, the parties recognized that PJV might be the party bringing an action involving Steadfast's subrogation rights.

Steadfast, on the other hand, argues that Endorsement 12 is inapplicable to the situation at hand because the arbitration proceeding was not a subrogation action. Instead, Steadfast maintains that Endorsement 11, governing Rectification Indemnity Coverage, applies and requires reimbursement to Steadfast of the $5 million it paid to PJV.

11

The Court thus agrees with Steadfast that Endorsement 11, not Endorsement 12, governs.

      **1.**      **Endorsement 12 Is Inapplicable Because the Arbitration Award Was Not "Recovery Obtained Through Subrogation."**

Condition N of the Policy, "Subrogation and Transfer of Rights of Recovery," is amended by Endorsement 12, "Amendment to Waiver of Subrogation Clients and Others Where Required By Contract." This provision refers to the insurance carrier's (Steadfast's) ability to step into the shoes of a damaged insured (PJV) to enforce a third party's (MSC's) liability up to the total amount the insurance carrier (Steadfast) paid or assumed. By definition, subrogation is "[t]he substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor." Black's Law Dictionary 352–53 (11th ed. 2019).

Here, PJV pursued an action against the third-party tortfeasor—Steadfast never sought to obtain recovery through subrogation. Steadfast was not a party to the arbitration that PJV brought against MSC. While PJV argues that the Endorsement 12 distribution process applies even where Steadfast is not the party prosecuting the third-party tortfeasor, the plain language of Endorsement 12 does not support this interpretation. Inclusion of the word "participate," if anything, requires Steadfast to partake in the action against the third-party. This does not, by its plain language, suggest that a subrogation action can somehow be brought *without* the insurer. PJV also argues that the first step of the distribution process, which provides for expenses incurred to the party bearing the expense, supports the interpretation that PJV alone could bring a subrogation action involving Steadfast's subrogation rights. This argument is equally unavailing. Just because another party—that is, the insured—could have incurred expenses during a subrogation action does not mean that the subrogation action could have been brought without the insurer's

12

involvement.

Indeed, the arbitration panel itself recognized that the arbitration was not a subrogation proceeding. Because Steadfast never brought a subrogation claim against MSC, and therefore never received any payment from MSC, the arbitration panel noted that it did not make sense for it to subtract the money that Steadfast paid to PJV in rectification in making its determination about what MSC owed to PJV:

> [T]here has not been any action on subrogation by [Steadfast] for its payment of $5M to PJV under its rectification policy. Therefore, because no subrogation action has been brought by [Steadfast] and MSC has not paid any amount to [Steadfast], there is no amount to be set off from the total amount of damages caused by MSC. The amount paid to PJV by [Steadfast] is effectively inadmissible and cannot be a setoff or credit from the total amount of damages caused by MSC . . . .

*In the matter of the Arbitration between Portsmouth JV v. MS Consultants, Inc.*, Final Award, at 12, Dkt. 10-10 at 12.

PJV repeatedly points to statements made by Steadfast prior to the February 2020 letter, including the March 2018 Coverage Advisory letter, that reserve Steadfast's right to subrogation as support for its assertion that Steadfast engaged in a "bait-and-switch" by suddenly invoking Endorsement 11. While Steadfast did reserve its rights to subrogation, it also expressly reserved its rights under Endorsement 11 throughout the process as well—including in the Settlement Agreement and Rectification Claim Release. Whether PJV incorrectly misunderstood that Endorsement 12, rather than Endorsement 11, would apply to the arbitration proceeding is beside the point, because Steadfast's right to reimbursement under the Rectification Indemnity Coverage part outlined in Endorsement 11 is not interchangeable with nor impacted by Steadfast's right to subrogation set forth in Endorsement 12. The two endorsements apply to different scenarios— Endorsement 12 applies to recovery "obtained through subrogation" by the insurer against a third-

party, and Endorsement 11 applies where the insured seeks compensation for its losses directly from the third-party for a design defect for which the insured previously undertook rectification efforts.[3]   And because the Court finds that Steadfast never exercised its subrogation rights under Endorsement 12 to obtain any recovery through subrogation, and therefore the arbitration panel's award of $7,501,878 was not a "recovery obtained through subrogation," Endorsement 12 and the Distribution Process set forth therein is inapplicable.   Additionally, because, as described below, there is clear language in the contract governing reimbursement in this scenario, applying the distribution process of Endorsement 12 would render the reimbursement language of Endorsement 11—that the parties agreed to—meaningless.

> ### 2.      Endorsement 11 Applies Because By Initiating the Arbitration, PJV Filed a Protective Indemnity Claim For the Same Design Defect that Was the Subject of the Rectification Indemnity Coverage.

While Endorsement 12 governs subrogation actions, Endorsement 11 concerns the Policy's Rectification Indemnity Coverage.   Unlike the distribution process set forth in Endorsement 12, Endorsement 11 requires reimbursement to the insurer of any money paid to the insured by the design professional's insurance under the Rectification Coverage.   Here, it is undisputed that Steadfast paid the $5 million in insurance proceeds to PJV under the Rectification Indemnity Coverage part of the policy.   PJV then filed a Protective Indemnity Claim—by commencing the arbitration proceeding—against MSC for the same design defect that was the subject of the Rectification Indemnity Coverage.   PJV was ultimately awarded $7,501,878 as total damages in

---

[3] PJV also argues that what it refers to as the "post-payment paragraph" of Endorsement 11 does not alter the distribution process of Endorsement 12, but rather incorporates it.   The Court agrees with Steadfast's characterization of this argument as a "red-herring."   Steadfast Opp. Br. at 17.   Whether Endorsement 11 incorporates Endorsement 12 is not determinative given that the two provisions address different scenarios, as described above, in which Steadfast can recover for funds it paid to the insured to cover expenses caused by a third-party.

the arbitration.   Accordingly, under the clear and unambiguous language of the Policy's Rectification Indemnity Coverage part (Endorsement 11), the proceeds PJV received from MSC's insurance "shall be used to reimburse" Steadfast "for any payments" (that is, the $5 million paid by Steadfast) "under the Rectification Indemnity Coverage afforded under this coverage part." Agati Decl. Ex. 1 at 32.

The Court finds that, in light of the clear language governing reimbursement in the context of the Rectification Indemnity Coverage part (Endorsement 11), Steadfast is entitled to reimbursement of the $5 million it paid to SJV from the arbitration award.[4]

## II.     Breach of Contract

Steadfast also moves for summary judgment on PJV's counterclaim for breach of contract, arguing that the claim fails as a matter of law because Steadfast never breached the Policy.   PJV, on the other hand, argues that Steadfast breached the contract by requesting in its February 2020 letter that it be reimbursed by MSC for the $5 million that it paid to PJV in Rectification Indemnity Coverage, rather than abiding by the distribution process set out in Endorsement 12.

"To prevail on a breach of contract claim under New York law, a plaintiff must prove (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir. 2000).

The Court thus finds that, as a matter of law, Steadfast did not breach the contract by requesting reimbursement of the $5 million.   By relying on Endorsement 11, rather than Endorsement 12, Steadfast was not breaching the contract, but rather was seeking to enforce the parties' contractual agreement as to the method of reimbursement in this particular context—where

---

[4] PJV asserts that Steadfast cannot rely on equity because it comes to this Court with unclean hands.   The Court need not address this argument because Steadfast possesses an enforceable, legal, contractual right to reimbursement under Endorsement 11 of the Policy.

the insured files a protective indemnity claim for a design defect that the insurer had previously paid it for.[5]

### III.    Bad Faith

Finally, Steadfast also moves for summary judgment on PJV's counterclaim for breaching the contract in bad faith.[6]  Steadfast argues that this claim fails as a matter of law because it is redundant of the breach of contract claim, PJV expressly released all claims for bad faith and extra-contractual damages against Steadfast, and finally, because Steadfast did not act in bad faith. While PJV did not address Steadfast's argument that its bad faith claim is redundant of its breach of contract claim, it argues that Steadfast engaged in bad faith by continuously suggesting that Endorsement 12 would govern, and then at the last minute, after the arbitration proceedings had closed, engaged in a "bait-and-switch" when it sought reimbursement under Endorsement 11.

Under New York law, neither consequential damages nor attorneys' fees are available to an insured absent a showing of bad faith on the insurer's part. *See Panasia Ests., Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 203 (N.Y. 2008) ("Consequential damages resulting from a breach of the covenant of good faith and fair dealing may be asserted in an insurance contract context, so long as the damages were within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting."); *Sukup v. State of New York*, 19 N.Y.2d 519, 522 (N.Y. 1967) (legal expenses may be recovered by an insured only upon "a showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert"

---

[5] Steadfast argues that PJV waived the argument that Steadfast breached the contract by neither moving for summary judgment on it nor addressing it in its opposition to Steadfast's motion for summary judgment.  Steadfast Reply Br. at 8.  Because the Court finds that PJV cannot assert a claim of breach of contract against Steadfast as a matter of law, it does not address the waiver argument.

[6] PJV's counterclaim contains only one cause of action titled "breach of contract and related contractual and extra-contractual damages," alleging that Steadfast breached the Policy in bad faith.  The Court analyzes the breach of contract and bad faith claims separately.

that same position).

There is "a very strong presumption against bad faith liability" on the part of an insurer. *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 624 (2d Cir. 2001). That presumption "can be rebutted only by evidence establishing that the insurer's refusal" to provide coverage "was based on more than an arguable difference of opinion and exhibited a gross disregard for its policy obligations." *Id*. at 625. Indeed, such a claim depends on a showing of "egregious conduct" on the insurer's part. *Hastings Dev., LLC v. Evanston Ins. Co.*, 701 F. App'x 40, 45 (2d Cir. 2017). Only when an insurance company's interpretation of the policy is "unreasonable" can bad faith be found. *See Jane St. Holding, LLC v. Aspen Am. Ins. Co.*, No. 13 CIV. 2291 RWS, 2014 WL 28600, at *10 (S.D.N.Y. Jan. 2, 2014), *aff'd*, 581 F. App'x 49 (2d Cir. 2014) (granting summary judgment to insurer on insured's bad faith claim); *see also Liberty Surplus Ins. Corp. v. Segal Co.*, 420 F.3d 65, 70 (2d Cir. 2005) (coverage dispute involved an "arguable difference of opinion" between insured and insurer, such that the insured could not recover attorneys' fees, even where the insurance policy "unambiguous[ly]" supported the insured's position); *99 Wall Dev., Inc. v. Allied World Specialty Ins. Co.*, No. 18-CV-126 (RA), 2021 WL 4460638, at *11 (S.D.N.Y. Sept. 29, 2021).

As a preliminary matter, pursuant to the Settlement Agreement, PJV expressly agreed to release all bad faith claims against Steadfast. All of Steadfast's conduct leading up to the Settlement Agreement that PJV alleges it interpreted as suggesting that Steadfast was going to rely on Endorsement 12 is thus shielded by this release. PJV appears, at times, to argue that it only entered into the Settlement Agreement because Steadfast never told PJV that it was going to have to pay PJV under the Rectification Indemnity Coverage—although it knew all along. PJV, however, is not now claiming and has never asserted that the Settlement Agreement and Release

is invalid or unenforceable.  Any claim of bad faith based on any of this conduct is thus covered by the release.  The only conduct that Steadfast engaged in following this release was issuing the February 21, 2020 letter.  This letter alone is therefore the only conduct that PJV can base its bad faith claim on.

The Court first notes that Steadfast did *not* deny PJV coverage—rather, it paid PJV $5,000,000 in Rectification Indemnity Coverage.  Additionally, as the Court discussed in detail above, Steadfast's interpretation of the contract that was the basis of its February 21, 2020 letter was more than reasonable—Steadfast sought to enforce a contractual right to reimbursement under Endorsement 11.  It had reserved that right at all times.  The record shows that Steadfast's behavior does not rise to the level of "egregious conduct" required to satisfy a bad faith claim, as the disagreement between the two parties was a good faith contractual dispute.[7]

## CONCLUSION

For the foregoing reasons, Steadfast's motion for summary judgment is granted and PJV's motion for summary judgment is denied.  The Clerk of Court is respectfully directed to terminate the motions pending at dockets 44 and 63 and close this case.

SO ORDERED.

Dated:    September 20, 2022
          New York, New York

_____
Ronnie Abrams
United States District Judge

---

[7] Because the Court finds that PJV cannot prevail on its bad faith claim as a matter of law, the Court need not address whether or not this claim was duplicative of the breach of contract claim.